UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
STANDARD INVESTMENT CHARTERED,       x
INC.,                                x
                                     x
                  Plaintiff,         x      07 Civ. 2014 (SWK)
                                     x
           -against-                 x
                                     x
NATIONAL ASSOCIATION OF              x      **OPINION AND ORDER**
SECURITIES DEALERS, INC., et al.,    x
                                     x
                  Defendants.        x
----------------------------------X

**SHIRLEY WOHL KRAM, U.S.D.J.**

On March 8, 2007, plaintiff Standard Investment Chartered, Inc. ("Standard") filed a class action complaint challenging the pending regulatory consolidation of the National Association of Securities Dealers, Inc. ("NASD") and the NYSE Group, Inc. ("NYSE") (the "Consolidation"). On March 26, 2007, the Securities and Exchange Commission ("SEC" or "Commission") published notice of proposed rule changes attendant to the Consolidation, and invited comment thereon. Shortly thereafter, Standard filed an amended complaint, asserting several additional claims against the NASD, three NASD officers (together, the "NASD Defendants"), and the NYSE. Now before the Court are motions to dismiss filed by the NASD Defendants and the NYSE on grounds of failure to exhaust administrative remedies, ripeness, immunity, and failure to state a claim upon which relief may be granted. For the reasons that follow, the

Court finds that Standard has failed to exhaust its administrative remedies, and grants the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).

**I.   BACKGROUND**

The NYSE, through its subsidiary, New York Stock Exchange LLC, and the NASD are both self-regulatory organizations ("SROs") registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). "As an SRO, the NASD is, like other SROs such as [the NYSE], authorized by Congress to 'promulgate and enforce rules governing the conduct of its members,'" and is subject to oversight by the SEC. DL Capital Group, LLC v. NASDAQ Stock Mkt., Inc., 409 F.3d 93, 95 (2d Cir. 2005) (citing Barbara v. New York Stock Exch., Inc., 99 F.3d 49, 51 (2d Cir. 1996)). The individual defendants, Mary L. Schapiro ("Schapiro"), Richard F. Brueckner ("Brueckner"), and Barbara Z. Sweeney ("Sweeney"), hold various positions of authority within the NASD, and all are alleged to have been actively involved in promoting the Consolidation.

On November 28, 2006, the NASD and the NYSE announced "a plan to consolidate their member regulation operations into a combined organization that will be the sole U.S. private-sector provider of member firm regulation for securities firms doing business with the public." (Am. Compl. ¶ 22.) As the consolidation of these entities requires the NASD to amend its

By-Laws, "the defendants solicited votes of NASD members in support of the [Consolidation] pursuant to a proxy statement dated December 14, 2006," and "scheduled a vote [of NASD members] on January 19, 2007" (Compl. ¶ 23), at which time the By-Law amendments were approved by a majority of voting members.

On March 8, 2007, the plaintiff, a member of the NASD, initiated the instant lawsuit as a class action, alleging that the Consolidation will disenfranchise certain NASD members and that the defendants failed to comply with Delaware state law while soliciting support for the Consolidation. The complaint sought an injunction barring the Consolidation and enactment of the proposed By-Law amendments, the issuance of a revised proxy statement, damages, and assorted other relief. On March 19, 2007, the NASD filed with the SEC the proposed By-Law amendments, which the SEC then published on March 26, 2007, in order to solicit comments from interested persons.

On April 10, 2007, the plaintiff filed an amended complaint. In addition to the three claims alleged in its initial complaint--(I) that Schapiro, Brueckner, and Sweeney breached fiduciary duties to the proposed class in negotiating the Consolidation and failing to disclose all material facts in the proxy statement; (II) that all defendants engaged in negligent misrepresentation with respect to the proxy statement; and (III) that the NYSE and the individual defendants will be

unjustly enriched by the Consolidation--Standard now alleges (IV) that NASD members have been denied their right to elect Governors of the NASD in violation of section 211 of the Delaware General Corporation Law; (V) that all defendants have improperly converted or, if the Consolidation is effected, will have taken the prospective class members' assets and/or "Member's Equity" (Am. Compl. ¶¶ 87-90); (VI) that all defendants have caused a substantial diminution in the value of NASD membership, with imminent completion of such diminution; and (VII) that all defendants have deprived the prospective class members of their voting membership. In Standard's words, the gravamen of the amended complaint "is that the terms of the consolidation represent a massive disenfranchisement of plaintiff and the members of the Class . . . and that their consent thereto was obtained only through a 'bum's rush' campaign" by the defendants. (Am. Compl. ¶ 2.)

## II.  DISCUSSION

The defendants move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(1) and (6). With respect to Rule 12(b)(1), the defendants argue that the Court lacks jurisdiction to consider the claims in the amended complaint because Standard has failed to exhaust its administrative remedies. See Hayden v. New York Stock Exch., Inc., 4 F. Supp. 2d 335, 338 (S.D.N.Y. 1998). As the following discussion

explains, challenges to NASD rulemaking, and the procedures incident to that rulemaking, are subject to the exhaustion doctrine. Because Standard has not exhausted its administrative remedies, the Court dismisses the amended complaint under Rule 12(b)(1). In light of this holding, the Court finds no occasion to reach the defendants' alternative grounds for dismissal under Rule 12(b)(6).

It is settled law that plaintiffs "must exhaust their administrative remedies before the SEC prior to attempting to obtain judicial review" of certain claims against that agency. Touche Ross & Co. v. Sec. & Exch. Comm'n, 609 F.2d 570, 582 (2d Cir. 1979). SROs, such as the NASD and the NYSE, are defined and limned by the Exchange Act, and are granted certain regulatory authority thereunder that would otherwise be exercised by the SEC. Therefore, courts have widely held "that the doctrine of exhaustion of administrative remedies, in appropriate circumstances, appl[ies] to challenges to disciplinary proceedings of" SROs. Barbara, 99 F.3d at 57; accord Swirsky v. Nat'l Ass'n of Sec. Dealers, 124 F.3d 59, 62 (1st Cir. 1997) (invoking exhaustion doctrine in context of a challenge to NASD disciplinary proceedings); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 616 F.2d 1363, 1370 (5th Cir. 1980) (same); First Jersey Sec., Inc. v. Bergen, 605 F.2d 690, 696 (3d Cir. 1979) (same); Datek Sec. Corp. v.

Nat'l Ass'n of Sec. Dealers, Inc., 875 F. Supp. 230, 233 (S.D.N.Y. 1995) (same). Although less common, courts in this District have also concluded that the exhaustion doctrine equally applies to both delisting disputes, see Belfort v. Nat'l Ass'n of Sec. Dealers, Inc., No. 93 Civ. 7159 (JSM), 1994 WL 97021, at *1 (S.D.N.Y. Mar. 24, 1994), and challenges to SRO rule changes. See, Am. Benefits Group v. Nat'l Ass'n of Sec. Dealers, No. 99 Civ. 4733 (JGK), 1999 WL 605246, at *8 (S.D.N.Y. Aug. 10, 1999).

Relying on these precedents, the defendants contend that the proposed By-Law amendments necessary for the Consolidation's consummation are an exercise of the NASD's rulemaking authority, and thus Standard must exhaust its administrative remedies under the Exchange Act before seeking judicial review. In essence, the defendants argue that the exercise of rulemaking authority here falls within the "complex self-regulatory scheme" enforced by the SEC, Merrill Lynch, 616 F.2d at 1368 (5th Cir. 1980), and thus all of the plaintiff's arguments--regarding substantive unfairness resulting from the By-Law amendments, the process by which the amendments were approved, and the alleged unjust enrichment arising therefrom--must be resolved by the SEC in its currently pending review.

Standard counters that it is not challenging the substance of the proposed By-Law amendments or the Consolidation per se;[1] rather, it is challenging the "defendants' failure to comply with Delaware state law in soliciting support among NASD members for the proposed NASD-NYSE regulatory consolidation . . . ." (Am. Compl. ¶ 1.) Fundamentally, Standard argues that the defendants' solicitation of support for the Consolidation, most obviously embodied in the proxy statement, and the underlying regulatory consolidation of the two organizations are governed by state corporate law, and thus the exhaustion doctrine is inapplicable.

Therefore, the principal questions before the Court are (1) whether challenges to NASD rulemaking are subject to the exhaustion doctrine; and, if so, (2) whether the procedures incident to the rulemaking at issue here are properly considered a part of the NASD's rulemaking authority, such that challenges to those procedures are subject to the exhaustion doctrine.

The NASD was incorporated on September 3, 1936, as a nonstock corporation in the State of Delaware. See Restated Certificate of Incorporation of Nat'l Ass'n of Sec. Dealers,

---

[1] Standard's position on this point has evolved over the course of this litigation. Compare Compl. ¶ 1 ("This is a Class Action brought against the defendants that challenges the fairness to NASD members of the NASD-NYSE regulatory consolidation . . . ."), with Am. Compl. ¶ 1 ("This Complaint does not challenge the wisdom of a consolidation of these two [SROs] . . . .") (emphasis in original).

Inc. Shortly thereafter, on August 7, 1939, the SEC granted the organization's application to become a national securities association pursuant to the Exchange Act. In re Application by Nat'l Ass'n of Sec. Dealers, Inc., 5 S.E.C. 627 (1939). The NASD's certificate of incorporation indicates, inter alia, that it is intended "to provide a medium for effectuating the purposes of [Section 15A of the Exchange Act]," and that "the members shall be entitled to vote . . . on any amendment to the By-Laws of NASD . . . ." See Restated Certificate of Incorporation of Nat'l Ass'n of Sec. Dealers, Inc. In addition, Article XVI of the NASD's By-Laws states that the NASD Board of Governors, following Board approval of a proposed By-Law amendment, "shall forthwith cause a copy to be sent to and voted upon by each member of the NASD." NASD By-Laws, art. XVI. Before taking effect, amendments must be approved first by a majority of voting members and then by the SEC under the relevant provisions of the Exchange Act. Id.

Congress has broadly defined an SRO's rules as including the organization's "constitution, articles of incorporation, [and] bylaws." 15 U.S.C. § 78c(a)(27). The Exchange Act "authorizes the SEC to exercise a significant oversight function over the rules and activities of the registered associations," United States v. Nat'l Ass'n of Sec. Dealers, Inc., 422 U.S. 694, 700-01 n.6 (1975) (citation omitted), "including the

responsibility to approve or reject any rule, practice, policy, or interpretation proposed by an SRO." DL Capital Group, 409 F.3d at 95 (citing 15 U.S.C. § 78s). This oversight is achieved through a tiered review process.

With limited exceptions not relevant here, all proposed SRO rule changes must be filed with the SEC before taking effect. See 15 U.S.C. § 78s(b)(1). The SEC must then publish notice of the proposed rule change and provide an opportunity for interested persons to comment thereon. Id. The Commission may not approve a proposed rule change absent a finding "that such proposed rule change is consistent with the requirements of [the Exchange Act] and the rules and regulations thereunder applicable to such organization." Id. § 78s(b)(2). For instance, when considering an organization's application for registration as an SRO, the SEC is charged with evaluating whether the rules of the organization "assure a fair representation of [the organization's] members in the selection of its directors and administration of its affairs;" "provide for the equitable allocation of reasonable dues, fees, and other charges among" the organization's members and other relevant parties; and "are not designed to permit unfair discrimination between . . . brokers[] or dealers." 15 U.S.C. § 78o-3(b)(4),(5) & (6). Thus, when reviewing a proposed rule change such as the proposed By-Law amendments here, the SEC is necessarily charged with

9

ensuring that the proposed rule change does not betray the baseline Exchange Act requirements on which SRO registration is conditioned. Furthermore, following a final SEC order approving a proposed rule change, the Exchange Act provides for review by the United States Court of Appeals. 15 U.S.C. § 78y(a).

Judge Koeltl relied on this comprehensive system of review in his dismissal of a lawsuit seeking to prevent the implementation of rules that had been approved by both the NASD and the SEC. See Am. Benefits Group, 1999 WL 605246, at *5-*8. Even though pre-approval review was no longer an option in that case, as it is here, Judge Koeltl observed that the plaintiff "had the opportunity to challenge [the rules] for sixty days after the Commission's approval of the NASD's proposed amendments . . . by petitioning the SEC and by filing a petition for review in the appropriate court of appeals." Id. at *5. By failing to challenge the rules in the appropriate forum, the plaintiff "denied the SEC the opportunity to address [the plaintiff's] concerns." Id. The Court agrees with Judge Koeltl that the exhaustion doctrine is properly applied to NASD rulemaking, including the amendment of its By-Laws. The scope of activities properly considered a valid part of NASD rulemaking, however, requires further examination.

As the exhaustion doctrine has been most fully developed in the context of SRO disciplinary proceedings, that context

provides guidance in determining the scope of activities that are properly considered part of the NASD rulemaking process for purposes of applying the exhaustion doctrine. In the disciplinary context, it is not uncommon for plaintiffs to attempt to avoid application of the exhaustion doctrine by alleging that an SRO violated state law not only with respect to the result of a disciplinary proceeding but also with regards to actions taken before, and in conjunction with, a proceeding. See, e.g., Swirsky, 124 F.3d at 61 n.1 (alleging tortious interference with contract and advantageous relations, fraud, defamation, and other state law violations pursuant to the settlement of an administrative proceeding); First Jersey, 605 F.2d at 693 (alleging interference with contractual and business relations prior to the initiation of a disciplinary hearing); Bruan, Gordon & Co. v. Hellmers, 502 F. Supp. 897, 900, 904 (S.D.N.Y. 1980) (alleging that conspiracy, tortious interference, and fraud pervaded an investigative audit and communications preceding a disciplinary proceeding). Such attempts to avoid exhaustion are invariably unsuccessful.

Bruan, Gordon is particularly instructive. In that case, the plaintiff, an NASD member, alleged that the NASD violated various state laws when it "carried out a 'dragnet' audit of plaintiff's books and records." Id. at 904. The Court noted that the plaintiff did not "contend that the NASD lack[ed] authority

to conduct such an audit," but "only complained of the manner in which the audit was conducted." Id. at 906. As such, "[t]he disciplinary proceeding provide[d] an obvious administrative forum for plaintiff to press its contention that the audit was improperly conducted." Id. The plaintiff also claimed that the unavailability of adequate administrative remedies obviated the need for direct complaint to the SEC, but Judge Motley concluded that this was itself evidence of a failure to exhaust remedies because "[t]he way to demonstrate that a remedy is inadequate is to exhaust it or point to prior demonstrated inadequacies." Id. at 908.

As is the case with challenges to procedures incident to SRO disciplinary actions, plaintiffs may not circumvent the exhaustion doctrine by framing their grievances as a challenge to the procedures incident to SRO rulemaking. In fact, despite the different context of Bruan, Gordon, the details of that case are strikingly analogous to the current litigation, right down to the charged rhetoric of the respective complaints. Just as the plaintiff in Bruan, Gordon contested the "dragnet" manner in which an authorized audit was conducted, and not the authority to conduct that audit in the first place, Standard does not, and cannot, challenge the NASD's authority to issue a proxy statement seeking membership approval of the proposed By-Law amendments; rather, it complains of the manner in which the

proxy solicitation was conducted, "through a 'bum's rush' campaign by all defendants . . . so as to create an apparent stampede in favor of the Transaction." (Am. Compl. ¶ 2.) Nor does Standard describe any attempt to bring its concerns regarding the allegedly "one-sided, deceptive and conclusory proxy statement" (Am. Compl. ¶ 2) to the attention of the NASD or the SEC, despite the existence of an ongoing SEC review of the proposed By-Law amendments that were adopted pursuant to that proxy statement. Cf. Bruan, Gordon, 502 F. Supp. at 906 (remarking that if the plaintiff alleges that a procedure "was conducted in a biased fashion, then plaintiff must demonstrate that bias by initially pressing its complaint before the NASD").

In fact, Standard has eschewed even greater opportunities for administrative review than did the plaintiff in Bruan, Gordon. Id. at 908 (noting that "Plaintiff could have complained directly to the SEC," that the "SEC has statutory authority to bring an injunctive action . . . against any SRO" pursuant to section 21(d) of the Exchange Act, and that the "SEC may also commence its own administrative proceedings against an SRO" pursuant to section 19(h) of the Exchange Act). As the SEC is currently considering the proposed rule change adopted pursuant to the contested proxy solicitation, and has requested comment on that proposed change, the plaintiff has had, and arguably still has, the opportunity to challenge the rulemaking before

the SEC in the first instance, not to mention on review. See Am. Benefits Group, 1999 WL 605246, at *5. Under these circumstances, the Court sees no appreciable difference between requiring plaintiffs to exhaust administrative remedies before challenging procedures used as part of an SRO's disciplinary proceedings, and insisting upon exhaustion when plaintiffs challenge procedures employed as part of an SRO's rulemaking authority. This follows from the proposition that the SEC has power to oversee the procedures incident to rulemaking, which is comparable, if not equal, to its power to review the procedures incident to an SRO's disciplinary proceedings. Therefore, Standard's claims challenging the proxy solicitation incident to the proposed By-Law amendments must be dismissed in favor of the current SEC review proceeding.

This conclusion is reinforced by the considerable scope of the SEC's control over SRO rulemaking. Textually, that control far exceeds the mere ability to review proposed rule changes. Section 19(c) of the Exchange Act provides the SEC with the power to sua sponte amend the rules of an SRO "as the Commission deems necessary or appropriate to insure the fair administration of the self-regulatory organization, conform its rules to requirements of [the Exchange Act] and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of [the Exchange Act]." 15 U.S.C. §

14

78s(c). Thus, because the rules of an SRO include its bylaws and articles of incorporation, the SEC theoretically has the authority under section 19(c) to sua sponte impose the By-Law amendments at issue here without a vote of the NASD membership, or under section 19(b) to disapprove a proposed By-Law amendment that was unanimously approved by the NASD membership. By registering as an SRO, an organization and its members necessarily forfeit certain powers held prior to the organization's registration.

The pervasive references to the Exchange Act throughout the NASD's governing documents, see <u>supra</u>, underscore this proposition. NASD regulatory actions are largely bound by the overarching purposes of the Exchange Act. Thus, the rules of an SRO are not solely within the control of its members, but must be informed by, and are subject to, the Exchange Act's essential mandate that SROs protect investors and the public interest. <u>See</u> 15 U.S.C. § 78o-3(a). In this sense, the SEC's considerable control over all aspects of SRO rulemaking is a fundamental part of the Exchange Act and its comprehensive scheme regulating the securities markets and the actors, such as brokers and dealers, which facilitate those markets. Thus, plaintiffs must initially challenge SRO rulemaking in front of the agency that administers the Exchange Act and in accordance with that agency's administrative scheme.

15

The exhaustion doctrine is especially appropriate here, where all of the remedies sought by Standard are either provided by the Exchange Act's administrative scheme or are plainly improper. Standard seeks primarily declaratory and injunctive relief with respect to the dissemination of the proxy statement and the consummation of the Consolidation. This type of relief is commonly requested in lawsuits attempting to avoid the exhaustion doctrine, and such claims are commonly dismissed nonetheless. See, e.g., Touche Ross, 609 F.2d at 573-74 (dismissing claim seeking declaratory and injunctive relief for failure to exhaust administrative remedies); Hayden, 4 F. Supp. 2d at 336, 340 (same). The Exchange Act grants the SEC numerous powers to seek an injunction, censure, and limit an SRO's activities, and to remove an officer or director of an SRO from office if "if he or she is found to have violated the rules or abused his or her position." Swirsky, 124 F.3d at 62 (citing 15 U.S.C. §§ 78u(d), 78s(h)(1), and 78s(g)(2)). These provisions are directly responsive to nearly all of Standard's prayer for relief.

In addition, Standard demands an accounting of its "Members' Equity." (Am. Compl. 27.) Yet the NASD's articles of incorporation clearly state that the "NASD is not organized and shall not be conducted for profit, and no part of its net revenues or earnings shall inure to the benefit of any

individual, subscriber, contributor, or member." Restated Certificate of Incorporation of Nat'l Ass'n of Sec. Dealers, Inc. Standard has not provided any support for the proposition that it is entitled to NASD assets or an accounting thereof. Furthermore, the Exchange Act provides the SEC with the power to review "dues, fees, and other charges among members," 15 U.S.C. § 78o-3(b)(5); thus, to the extent that Standard questions the allocation of any "cash payments and dues credits" pertinent to the Consolidation (Am. Compl. ¶ 2), the SEC is well-positioned to address such concerns and has the tools at its disposal to do so.

As for Standard's request for damages, those claims are based entirely on a future contingency--the Consolidation's consummation. Therefore, although the Second Circuit has indicated that damages claims should generally not be dismissed on exhaustion grounds, that presumption carries less force where the plaintiff does not seek "compensation for past harms," but merely includes a speculative claim for future damages in the event a companion request for injunctive relief is denied. Barbara, 99 F.3d at 57 (citing Plano v. Baker, 504 F.2d 595, 599 (2d Cir. 1974) ("[A] boilerplate claim for damages will not automatically render the administrative remedy inadequate.")). Because Standard is also challenging the very condition that would cause its speculative "monetary" damages, and that

challenge is itself subject to exhaustion, allowing Standard's monetary claims to proceed on their own would unduly circumvent the purpose of the exhaustion doctrine.

In requiring Standard to exhaust its administrative remedies, the Court also takes note of the SEC's considerable experience with the substance of the claims alleged here. The SEC is charged with reviewing whether an SRO "assures a fair representation of its members in the selection of its directors and administration of its affairs." See 15 U.S.C. § 78o-3(b)(4). It follows that the agency is required to ensure not only that the proposed By-Law amendments meet the goal of fair representation, but that the procedure by which the By-Law amendments were adopted also fulfills this goal. Although the SEC is not generally charged with reviewing the communications of nonstock corporations, those nonstock corporations that register to become SROs place themselves within the ambit of the SEC's authority to the extent described by Congress in the Exchange Act. This includes the oversight, and even the forfeiture, of their rulemaking authority as related to the purposes of the Exchange Act. 15 U.S.C. § 78s(b) & (c).

It is hard not to appreciate the irony inherent in the contention that the SEC is an unsuitable forum in which to consider whether the NASD as a corporation is "speak[ing] the truth when talking to its" members, Sec. & Exch. Comm'n v. Nat'l

18

Sec., Inc., 393 U.S. 453, 463 (1969), given that the SEC is fundamentally engaged in regulating the verity of almost identical communications made by issuers to their stockholders. The Court is incredulous that the SEC would endorse proposed SRO rule changes that were approved by the membership pursuant to a "proxy statement that could not possibly pass [muster] under the nation's securities laws and the disclosure requirements of the SEC's own rules (see, e.g., § 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder by the SEC and applicable Supreme Court precedent)." (Am. Compl. ¶ 4.) Furthermore, SEC approval of the proposed By-Law Amendments is always subject to review by the United States Court of Appeals. 15 U.S.C. § 78y(a).

Ultimately, the consolidation of the regulatory operations of two organizations currently regulating brokers and dealers is within the SEC's expertise. The apportionment of voting rights held by brokers and dealers within their organization is also expressly subject to SEC oversight pursuant to the Exchange Act. Furthermore, the SEC has relevant expertise regulating corporate disclosures in the context of the securities markets. Thus, substantively, as well as procedurally, the SEC is well-suited to consider the allegations of the amended complaint.

Standard does not challenge the policy behind applying the exhaustion doctrine to the SRO rulemaking process generally, nor

does it provide any relevant precedents in which a similar exhaustion defense was considered and rejected. Rather, Standard argues that state law is not supplanted by federal securities law and that state corporate law plays an important role in the governance of SROs, as demonstrated most recently in cases involving the NYSE and the Philadelphia Stock Exchange ("PHLX"). Nonetheless, the arguments and authority provided by Standard do not compel a result different from the one reached here.

    In the first place, this Opinion does not consider whether Delaware state law is supplanted by the Exchange Act. Holding that Standard is required to exhaust its administrative remedies here preempts state law no more or less than does the application of the exhaustion doctrine to claims alleging violations of state law in the context of SRO disciplinary proceedings. See, e.g., Swirsky, 124 F.3d at 61 n.1, 62 (dismissing tortious interference, fraud, defamation, and other state law violations for failure to exhaust administrative remedies); Bruan, 502 F. Supp. at 900, 904, 906 (dismissing conspiracy, fraud, and tortious interference claims for failure to exhaust administrative remedies). By its very nature the exhaustion doctrine deprives a party of the right to file suit prior to exhausting its claims before the appropriate

administrative body; Standard's citation to preemption cases is therefore inapposite.[2]

With respect to the role of state corporate law in the governance of SROs, none of Standard's authorities address the issue of exhaustion, nor do they involve an SRO's exercise of its rulemaking authority. For instance, New York v. Grasso, 350 F. Supp. 2d 498 (S.D.N.Y. 2004), presented the question of whether an action alleging that the NYSE violated a New York State law by paying an executive unreasonable compensation was properly removed to federal court. Id. at 499-500. Judge Lynch remanded the case, concluding that federal jurisdiction was not appropriate "where a state agency seeks to enforce state laws relating to the compensation of officers or employees of a self-regulating organization." Id. at 507. Not only was there no consideration of exhaustion in Grasso, but the SRO action at issue in that case was wholly unrelated to the regulatory powers granted by the Exchange Act and overseen by the SEC. The proposition that a federal court does not have jurisdiction over

---

[2] Furthermore, Standard's only authority on preemption related to the regulation of the securities industry was decided prior to the Securities Act Amendments of 1975, which "drastically shifted the balance of rulemaking power in favor of Commission oversight." Credit Suisse First Boston Corp. v. Grunwald, 400 F.3d 1119, 1129 (9th Cir. 2005). In fact, courts have more recently concluded that "SRO rules that have been approved by the Commission pursuant to 15 U.S.C. § 78s(b)(2) preempt state law when the two are in conflict, either directly or because the state law stands as an obstacle to the accomplishment of the objectives of Congress." Id. at 1132.

a lawsuit that does not involve any SRO actions subject to SEC oversight fails to persuade the Court that it should take jurisdiction over a rulemaking that is currently being reviewed by the SEC.[3]

Nor does the existence of state court actions related to the demutualization of the NYSE, see In re New York Stock Exch./Archipelago Merger Litig., 824 N.Y.S.2d 764, 2005 WL 4279476, at *2 (N.Y. Sup. Ct. 2005) (discussing a settlement in the context of the NYSE's plan "to convert the NYSE's not-for-profit status into a public, for-profit corporation"), or the PHLX, see Ginsburg v. Philadelphia Stock Exch., Inc., Civ. A. No. 2202-N, at 6 (Del. Ch. Dec. 7, 2006) (Pl.'s Opp. Ex. 6), affect the Court's analysis of the applicability of the exhaustion doctrine in the specific circumstances of this case.

---

[3] Securities Exchange Commission v. National Securities, Inc., 393 U.S. 453, 463 (1969), is no more helpful to Standard's position. In that case, the Supreme Court held that a state law regulating the insurance industry did not support McCarran-Ferguson Act preemption of a securities action brought by the SEC in an attempt to "protect security holders from fraudulent misrepresentations," and thus the proceedings could exist contemporaneously. Id. at 463. However, the Court noted: "Different questions would, of course, arise if the Federal Government were attempting to regulate in the sphere reserved primarily to the States by the McCarran-Ferguson Act. But that is not this case." Id. In light of this distinction, the value of National Securities to Standard's argument is questionable. Indeed, not only does this undermine the plaintiff's preemption argument, as the Supreme Court recognized the supremacy of federal law, but the Court also noted the preeminent position of the SEC in protecting corporate constituents from misrepresentations.

The failure of the defendants in those actions to raise an exhaustion argument has no bearing on the legal analysis to be applied to the contentions raised in this litigation, regardless of any passing resemblance the context of those actions may have to the broader context in which the NASD rulemaking here is taking place.

Finally, although Standard does not explicitly argue that its claims fall into any exceptions to the exhaustion doctrine, see, e.g., Am. Benefits Group, 1999 WL 605246, at *7 (citing Guitard v. U.S. Sec'y of the Navy, 967 F.2d 737 (2d Cir. 1992)), the Court, having considered the amended complaint and Standard's submissions, finds that Standard's allegations are insufficient for this case to fall within any of those exceptions.

## III. CONCLUSION

For the reasons discussed above, the Court grants the defendants' motions to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(1) for failure to exhaust administrative remedies. The Clerk of Court is directed to enter judgment for the defendants dismissing all claims and closing this case.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE


Dated:     New York, New York
           May 2, 2007